# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,
    Plaintiff,

v.                                       Case No. 01-CR-108

THOMAS SIENKOWSKI,
    Defendant,

## SENTENCING MEMORANDUM

Defendant Thomas Sienkowski pleaded guilty to a racketeering conspiracy arising out of his involvement with the Outlaws Motorcycle Club, and I sentenced him to 120 months in prison. The government appealed my decision not to impose an enhancement under U.S.S.G. § 3B1.1(b) for aggravating role in the offense, and the court of appeals remanded to allow the government to submit evidence in support of its position.

The government submitted an evidentiary proffer, then called former Outlaws Ronald Talmadge and Edward Anastas, who testified as to defendant's role in the conspiracy. Although Talmadge offered little relevant to the enhancement, Anastas's testimony, which I found credible, was sufficient to establish that defendant organized and directed others.[1]

The parties agreed to re-sentencing defendant based on the evidence of record without holding a new sentencing hearing, and defendant waived his further appearance in

---

[1] The government included with its proffer information from Chicago chapter president Carl Jay Warneke. (R. 354 at 10.) However, aside from identifying defendant's titular position within the Outlaws, Warneke was unable to provide specifics on the issue of defendant's role in the offense. For example, he could not recall whether defendant was present at a meeting in the fall of 1994 where the Outlaws discussed traveling to Lancaster, New York to confront the Hell's Angels.

court. As the government concedes, based on the Supreme Court's decision in <u>United States v. Booker</u>, 125 S. Ct. 738 (2005), neither the role enhancement nor any other guideline factor are binding. Nevertheless, in light of the factors I must consider under 18 U.S.C. § 3553(a), including the advisory guideline range, I conclude that some increase in defendant's sentence is warranted based on the applicability of the aggravated role enhancement.

In this memorandum, I explain my ruling on the enhancement, then set forth the reasons for the new sentence I impose.

## I. FACTS AND BACKGROUND

Defendant joined the Milwaukee chapter of the Outlaws, becoming vice president in about 1992 and president in 2000, when then-president Anastas became a regional leader. During much of this time, the Outlaws were involved in a territorial war with other motorcycle clubs, including the Hell's Angels and their affiliates. The racketeering conspiracy with which defendant (and various other Outlaws) were charged arose out of this conflict.

The indictment alleged seven predicate acts. The first was a November 1993 attempt to murder Patrick Matter, president of the Hell's Angels chapter in Minneapolis. A team of Outlaws, consisting of Scott Hammond from the Milwaukee chapter and James Schneider and Randall Miller of the Janesville chapter, traveled to Minneapolis, surveilled Matter, but failed to get a shot at him and returned to Wisconsin. Anastas testified that defendant approached him about the plan and said that there was a crew of guys who wanted to go to Minnesota to look for Hell's Angels. Defendant asked Anastas for surveillance photos

2

and a weapon. Anastas obtained the materials, and he and defendant then met with Schneider, Miller and Anastas, and provided them with the materials.[2]

The second predicate act arose out of a December 1993 plot to place a bomb under Matter's truck. The bomb was assembled at defendant's house, but he took his family away while others worked and was not involved in its construction. The bomb was placed under Matter's truck on December 15, 1993, and Miller accidentally detonated it early, destroying the truck but injuring only himself.

The third act arose out of a June 14, 1994 attempt to kill members of the Hell's Henchmen during their motorcycle run through Rockford, Illinois. O'Neill gathered several Outlaws, including defendant, at a hotel in Rockford and instructed them to shoot a rider in the front, which would cause a "domino effect" knocking down the others. Defendant and Hammond went armed with an AK-47 assault rifle but never got a shot because of civilian traffic. O'Neill then directed the Outlaws to a bar where he though the Henchmen would go, but they never showed up and the Outlaws dispersed.

The fourth act arose out of an Outlaw attempt to confront the Invaders, an affiliated club of the Hell's Angels, at the Illiana Speedway on June 26, 1994. The Outlaws brought a fortified van to the speedway containing weapons, which was supervised by Hammond and defendant. But the Invaders never showed, and the Outlaws went home.

The fifth act arose out of the bombing of the Hell's Henchmen clubhouse on Grand Avenue in Chicago. Outlaws national president Harry Bowman approved the plan to bomb the clubhouse, and at a regional meeting Anastas was asked to have the Milwaukee chapter

---

[2]Schneider and Miller had been directed to meet with Anastas by Janesville president Kevin O'Neill.

3

take responsibility for the bomb's construction. Defendant purchased explosives with club money, then brought them to an apartment where Anastas and Milwaukee Outlaw Al Venus constructed the bomb. They then took the bomb to defendant's house and built a metal box for it. Hammond took the front seat out of a car to accommodate the bomb. Defendant was present at a later regional bosses' meeting where placing the bomb was discussed. On November 7, 1994, a Chicago Outlaw named Raymond Morgan drove the car containing the bomb onto the sidewalk near the clubhouse, where it exploded, causing considerable damage but no injuries.

The sixth predicate act arose out of a June 1996 plan to confront Hell's Angels at the Morocco Speedway in Indiana, and Anastas testified that he put Hammond and defendant in charge of security.[3] Anastas testified that security was a shared responsibility between the two, and it involved organizing a schedule for various Outlaws to stand armed guard duty. Apparently, no confrontation occurred.

The final predicate act involved defendant's sale of marijuana (and small amounts of cocaine), primarily to other Outlaws.

Defendant pleaded guilty, and the probation office prepared a pre-sentence report ("PSR"), which calculated his offense level ("OL") as 33 (base OL 28 for predicate acts 1-6, U.S.S.G. § 2A1.5(a), base OL 24 for act 7, § 2D1.1(c)(8), combined OL 33 under § 3D1.4, plus 3 for role in the offense, § 3B1.1, and minus 3 for acceptance of responsibility, § 3E1.1), and his criminal history category as II, for an imprisonment range of 151-188

---

[3]This testimony was contrary to a previous statement Anastas gave to law enforcement, in which he said that he put Hammond in charge of security for this event. (R. 356 bate stamped page #023966.)

4

months. I declined to impose the § 3B1.1 enhancement, noting that there was no evidence that defendant directed others in any of the predicate acts. I further noted that:

> Even considering the conspiracy as a whole, I could not conclude that the enhancement was proper . . . . There was no evidence that defendant supervised or directed others in the "war" with rival motorcycle gangs. Defendant's participation in many of the specific acts was peripheral. He never detonated a bomb or fired a shot. There was no evidence that he recruited others to join the Outlaws, or that he claimed a larger share of the proceeds of the conspiracy's unlawful conduct. Finally, even if he was present at "bosses" meetings, there was no evidence that his level of participation at those meetings warranted an offense level enhancement.

United States v. Sienkowski, 252 F. Supp. 2d 780, 783-85 (E.D. Wis. 2003), vacated, 359 F.3d 463 (7th Cir. 2004). As noted, the Seventh Circuit remanded for presentation of additional evidence.

## II. DISCUSSION

In light of Booker, I typically follow a three-step sentencing process. First, I determine the applicable advisory guideline range, resolving any factual disputes. Second, I determine whether, pursuant to the Sentencing Commission's policy statements, any departures from the advisory guideline range clearly apply. Finally, I determine the appropriate sentence in light of the factors set forth in 18 U.S.C. § 3553(a). See, e.g., United States v. Pallowick, 364 F. Supp. 2d 923, 925-26 (E.D. Wis. 2005).

**A.  Guidelines**

The only guideline issue is whether defendant should receive an enhancement for role in the offense under U.S.S.G. § 3B1.1.

**1.  Standard**

Section 3B1.1 provides:

5

Based on the defendant's role in the offense, increase the offense level as follows:

> (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.
>
> (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.
>
> (c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

"To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." U.S.S.G. § 3B1.1 cmt. n.2. The guideline:

> provides a range of adjustments to increase the offense level based upon the size of a criminal organization (i.e., the number of participants in the offense) and the degree to which the defendant was responsible for committing the offense. This adjustment is included primarily because of concerns about relative responsibility. However, it is also likely that persons who exercise a supervisory or managerial role in the commission of an offense tend to profit more from it and present a greater danger to the public and/or are more likely to recidivate. The Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility.

§ 3B1.1 cmt. background.

Application note 4 explains:

Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This

6

adjustment does not apply to a defendant who merely suggests committing the offense.

§ 3B1.1 cmt. n.4.

The government bears the burden of proving the applicability of the enhancement by a preponderance of the evidence. United States v. Joiner, 183 F.3d 635, 644 (7th Cir. 1999). District courts are not required to employ a higher standard post-Booker, see United States v. Robinson, 435 F.3d 699, 701 (7th Cir. 2006), however, they may in the exercise of discretion require a high degree of confidence in any disputed factual matter that will affect the sentence, see United States v. Leroy, 373 F. Supp. 2d 887, 889 n.2 (E.D. Wis. 2005) (citing United States v. Gray, 362 F. Supp. 2d 714, 723 (S.D. W. Va. 2005)).

**2. Analysis**

The pre-sentence report ("PSR") stated: "During the time frame of this Indictment, the defendant was the Vice President of his Outlaws chapter. This position entitled him to attend bosses meetings and assume the role of President when the elected president was not available. Mr. Sienkowski assisted in the planning of the racketeering acts which comprise this Indictment, and he also directed the activities of others in carrying out these acts." (PSR ¶ 128.) However, titles "are not controlling," U.S.S.G. § 3B1.1 cmt. n.4, and supervision or control of other participants in non-criminal activities does not merit an enhancement, see, e.g., United States v. DeGovanni, 104 F.3d 43, 46 (3d Cir. 1997). Further, the PSR failed to set forth any specific direction in specific criminal activity.

The testimony of Talmadge on remand did little to bolster the government's case. He stated that the Outlaws held bosses' meetings, at which combat with rival gangs was

7

discussed, and that as a leader defendant "would have had to be there." (9/9/04 Tr. at 15; 21.) However, he was unable to recall defendant "making any statement directly, at any meeting, with regard to planning, organizing, leading, managing, sharing in the proceeds of any of these events." (Id. at 32.) When the prosecutor asked him about a specific meeting at which the bombing of the Grand Avenue clubhouse was discussed, Talmadge stated that he walked out because he "didn't want no part of it." (Id. at 16.)[4] Talmadge was also asked about a September 1994 confrontation at the Lancaster Speedway, at which members of defendant's chapter were allegedly present, but he was unable to provide any information as to defendant's role or even whether defendant was there. (Id. at 37.)

Anastas was able to provide support for the enhancement.[5] Even then, much of his testimony was general. He stated that defendant was in charge of organizing security for events the Outlaws went to, including the Illiana Speedway event, which involved obtaining and dispensing weapons. (1/19/05 Tr. at 19-22.) He further stated that defendant, along with co-defendant Hammond, was in charge of making up the guard duty roster for events and motorcycle runs. (Id. at 23.) He stated that at one point or another, defendant probably directed most or all of the thirty members of the chapter.[6] (Id. at 24-25.) He also testified

---

[4]In its proffer, the government stated that Talmadge would testify that he knew Anastas and defendant were in charge of the Grand Avenue bomb construction because it was discussed at one of the bosses meetings he attended. (R. 354 at 11.)

[5]Although defendant pointed out a few minor discrepancies between Anastas's testimony and his prior statements, based on his demeanor I found his testimony to be straightforward and credible.

[6]Although the Seventh Circuit has backed away from earlier cases suggesting that the court has to specifically identify the participants the defendant directed, United States v. Mansoori, 304 F.3d 635, 668-69 (7th Cir. 2002), it is nevertheless doubtful that a vague statement that the defendant at some point over the course of a thirteen year conspiracy

8

that defendant directed another member to get gun powder to construct a bomb used to destroy the Hell's Henchmen clubhouse in 1990.[7] (Id. at 25-26.)

Regarding the Lancaster Speedway event (which was not charged as a predicate offense), Anastas provided specific information as to defendant's leadership role. He stated that defendant attended a regional bosses' meeting in his place, at which defendant was told that the Buffalo chapter needed members to help beef up the organization. Defendant set up a crew consisting of Mike Rockefeller, Jimmy Wedierniak, Dan Folgrum and Jack Rozga, and they proceeded to Buffalo.[8] (Id. at 16-17.) However, before the Milwaukee crew was able to park their van and get inside the venue, a shootout erupted,[9] and defendant and his crew were unable to participate.[10] (Id. at 17-18.)

Anastas's testimony showed that defendant organized and directed others in at least one specific incident, and that he directed others in performing security work generally (at least in tandem with Hammond).[11] This is sufficient to justify the enhancement. See United

---

directed every member is sufficient.

[7]This incident was not charged as a predicate act but was within the time frame of the charged conspiracy. It appears that this is a different incident from the 1994 bombing set forth in predicate act 5.

[8]I note that in a previous statement to law enforcement, Anastas stated that these crew members had already made plans to go to New York. (R. 356 bate stamped page #023954.)

[9]A Hell's Angel and an Outlaw were killed.

[10]In its proffer, the government stated that defendant's crew participated with other Outlaws in an armed confrontation with the Hell's Angels at the speedway. (R. 354 at 6.) The evidence showed that the Milwaukee crew did not participate in the shootout.

[11]I continue to have some doubts that defendant was an organizer/leader in other aspects of the conspiracy. Regarding his "security" work, the evidence shows that

9

States v. Blaylock, 413 F.3d 616, 618 (7th Cir. 2005) ("In determining the defendant's role, the sentencing court must assess all 'relevant conduct' under U.S.S.G. § 1B1.3, not just the elements of the offense charged.").

Therefore, the (now advisory) guidelines are offense level 33, criminal history category II, imprisonment range 151-188 months, and fine range $17,500-175,000.

**B.     Departure**

At the original sentencing, defendant moved for departure under U.S.S.G. § 4A1.3, but I rejected his argument. He has not requested any departures on remand, thus I turn to imposition of sentence under § 3553(a).

**C.     Section 3553(a)**

In imposing sentence, I consider the factors set forth in § 3553(a), which include:

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)     the need for the sentence imposed–

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)     the kinds of sentences available;

(4)     the advisory guideline range;

(5)     any pertinent policy statements issued by the Sentencing Commission;

---

Anastas usually put defendant and Hammond in charge together, and Hammond received no § 3B1.1 enhancement. This was so even though he later became president of the Park Falls chapter of the Outlaws.

10

(6) the need to avoid unwarranted sentence disparities; and

(7) the need to provide restitution to any victims of the offense.

Upon consideration of these factors, my task is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2). 18 U.S.C. § 3553(a).

**1. Nature of Offense**

Defendant held a leadership position in a criminal organization involved in a violent war with other motorcycle gangs. However, the striking thing about his involvement was how little he actually accomplished in that war. He participated in a meeting about shooting Hell's Angel president Matter, but he did little to effectuate the plan, and the crew sent never got off a shot. He allowed a bomb intended for Matter to be built at his house, but he did not participate in its construction, and the Outlaw sent to Minneapolis to kill Matter set it off accidentally, injuring only himself. Defendant went armed to shoot Hell's Henchmen during a run through Rockford but never got off a shot. He went armed to Illiana Speedway but no confrontation with rivals occurred. He helped build a bomb that partially destroyed the Hell's Henchmen clubhouse in Chicago, but no one was hurt. He traveled armed to Morocco but nothing happened there. He dircted a crew to Lancaster but the Outlaws' confrontation with their rivals occurred before he could park the van. And he sold drugs to fellow Outlaws.

I do not in any way minimize the seriousness of defendant's crime. Even the planning of such actions constitutes a serious violation of the law and presents a danger to the public. However, I must consider whether a sentence approaching the statutory maximum of twenty years is appropriate given the limited nature of defendant's actual conduct. See United States v. Lister, 432 F.3d 754, 762 (7th Cir. 2005) (noting that the sentence imposed nearly

11

reached the statutory maximum, leaving "little room for the proportional sentencing that motivated Congress to pass the sentencing guidelines, a motivation recognized and supported by the Supreme Court's second holding of Booker"); United States v. Newsom, 402 F.3d 780, 785-86 (7th Cir. 2005) ("Those who think that the idea of marginal deterrence should play some part in criminal sentences – that is, that the harshest sentences should be reserved for the most culpable behavior – might find little room left above Newsom's sentence for the child abuser who physically harms his victim, who abuses many different children, or who in other ways inflicts greater harm on his victims and society.").

### 2. History and Character of Defendant

Defendant's life outside the Outlaws was pro-social. He was married for over twenty years and the father of two children, both of whom had serious health problems. A life-long resident of the Milwaukee area, defendant owned his own home and held the same job at Bucyrus Erie for twenty-five years. He also served as vice president of his union for twelve years. Both his employer and the union spoke highly of him. He had no substance abuse problems.

Defendant had a minimal criminal record, consisting of a carrying a concealed weapon offense from 1985 and a possession of marijuana offense from 1988. He also had non-criminal ordinance violations for disorderly conduct and shoplifting in 1993 and 1995.[12]

### 3. Needs of Public

Evaluating the needs of the public is difficult in this case, given defendant's dual life. Obviously, the actions of the Outlaws constituted a threat to society, but defendant's life was

---

[12]Defendant also presented evidence of his good conduct and educational efforts in prison after he was originally sentenced.

12

otherwise productive. Given his limited record, the dissolution of the Outlaws, and his family circumstances, he seems a lower risk of recidivism. However, there is a need for a substantial period of confinement to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and deter others.

### 4. Consideration of Guidelines, Types of Sentences Available, & Need to Avoid Unwarranted Disparity

The advisory guidelines call for a prison sentence of 151-188 months. Given the nature of the offense and the history and characteristics of the offense, this range is somewhat greater than necessary to satisfy the purposes of sentencing. 18 U.S.C. §§ 3553(a)(1) & (a)(2). For the reasons stated above, the offense conduct was mitigated compared to what the Commission likely had in mind when it set the range, defendant's conduct was not such that a sentence approaching the statutory maximum is necessary, and the guidelines do not account for defendant's significant pro-social conduct, also discussed above. See United States v. Ranum, 353 F. Supp. 2d 984, 986, 991 (E.D. Wis. 2005) (noting that guidelines do not account for positive personal characteristics, such as employment record and family ties, and that sentence below range may be warranted when such factors are present). Further, I consider under § 3553(a)(6) that co-defendant Hammond committed essentially the same acts defendant did, including those that led to the imposition of the § 3B1.1 enhancement, yet he received no such enhancement. His offense level was 30 and criminal history category III. Following a departure to category II under U.S.S.G. § 4A1.3, I sentenced him to 108 months, the low end of the then-mandatory guideline range (108-135). United States v. Hammond, 240 F. Supp. 2d 872 (E.D. Wis. 2003). It would be disproportionate to sentence defendant to a significantly longer term.

13

See Newsome, 428 F.3d at 688 ("Now that the district court is obliged directly to confront all of the § 3553(a) factors, however, comparison of sentences has become a permissible part of the overall sentencing determination.").

I will take into account the additional evidence proffered by the government, which showed a slightly greater role than was presented originally. Because this evidence does not substantially alter my analysis of the case, however, I decline to impose a sentence within the new advisory range. Under all of the factors set forth in § 3553(a), I conclude that a sentence of 135 months is sufficient but not greater than necessary. This sentence falls at the low end of a range 2 levels higher than the original sentence, which adequately accounts for the new evidence presented. It is also consistent with the range under which I sentenced Hammond.

### III. CONCLUSION

Therefore, defendant is sentenced to 135 months in prison on count one. All other conditions of the original judgment are re-imposed. An amended judgment will issue consistent with this decision.

**SO ORDERED**.

Dated at Milwaukee, Wisconsin, this 4th day of March, 2006.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge